The defendant in this case moved for a summary judgment, which the District Court granted. The District Court based its decision on Mr. Higbie's failure to allege any adverse action, any causal link, and his failure to present substantial evidence of pretext. I hope to convince the Court today that the District Court erred in making these rulings. As a background, Mr. Higbie started working with the Department of State in 1998. He was a Foreign Service agent at the time. His designation as a Foreign Service agent subjected him to being moved around the country at various points in time. In 2001, Mr. Higbie filed an EEO complaint. At the time, he was working at the Dallas Resident Office. And part of the resolution of the complaint was that Mr. Higbie be transitioned from a Foreign Service agent to a Civil Service agent, meaning that he was no longer subject to being transferred across the world and would be located permanently in Dallas office. Now, this, I believe, is the thrust of all the subsequent actions that Mr. Higbie has been subjected to. It can be fair inference to raise that not being subjected to being moved across the world is a pretty good situation to be in as a government official. So, in 2005, that resolution was reached. In 2008, we have the first complaint of adverse action. And I'll go through each of the adverse actions separately and address the causal link and the pretext. The first— But just to be clear, you're not contending that anybody suggested he's now going to be subject to being moved from place to place, are you? He's no longer subject to be moving place to place. Okay. That's what I thought. No. No, permanently he is in Dallas, and he's allowed to stay there. However, the dispute arises. I think that's the thrust of the reasons why these supervisors would come in. You know, he was given a benefit of his prior EEO complaint of being positioned in one place. And because of that benefit, I think that was the driving force for these supervisors to take action against him for this protected activity. So the first adverse action occurred in 2008. And Mr. Higby was working in the Dallas office, and his direct supervisor was going on leave for, I believe, a 30-day period of time. And whenever his direct supervisor would go for leave, he would appoint somebody to assume his duties during that period of time. Mr. Higby, in the past, had been appointed to this position. However, supervisors in the Houston office, which is a supervisory office over the Dallas office, went ahead and said, No, we want you to start to implement a new policy. We do not want Mr. Higby, who is now classified as a service member who is located only in the Dallas office. We want foreign service agents to get that experience. In addition to Mr. Higby, he was just – others were added in a rotation. He was added in the rotation. However, he did in his declaration in his testimony state that he was not picked as often as he used to be picked. And in this process, it was a deselection as well. He was poised to go ahead and assume the role, but deselected. The agency cites a case called Browning. And in Browning, the employer had a standard practice in which they would rotate through individuals. And the employer stated this, and the employee also agreed, yes, that is a normal practice. Here, that's not the situation. This new practice came about because of Mr. Higby about to assuming the stand-in supervisory role. That's an adverse action, which subjected him to being – working under somebody of a lower level. In the government, there's rankings that are given to different employees. He's a general service and classified as a Level 13 employee there. In the Foreign Service, there's Level 3s and Level 2s and subjects here. The lower you get, the more duties and authority that you have. Based off of evidence that he submitted to the court, his equivalency was with an FS2, so the higher-grade employee. And when this new policy was implemented, his direct supervisor was asked to select FS Level 3s, so inferior employees based off the ranking given by the government manual. So this is the adverse action. We believe that Mr. Higby's case is unique based off the fact that he was deselected and this new policy was implemented on Lake Browning. Moving on to the causal connection, it's true that his original complaint arose out of 2001, and this was the only protected activity that occurred before this adverse action took place. While the settlement occurred in 2005, three years later, this adverse action took place. The causal link is that his supervisor in Houston first learned of this activity shortly before implementing the new policy. So there are decisions, citing Cawthorne, which is this circuit's decision, unpublished, which say the temporal proximity with close proximity to the adverse employment action can constitute a causal connection. And it's not as astringent as a requirement as the but-for pretext level that I'll discuss in a few minutes. So this causal link that this court should go ahead and adopt in Cawthorne is not a starting point from seven years ago where the EEO complaint was filed or where the settlement, but it's upon the supervisor's learning of the protected activity. So there's a close proximity from the Houston supervisor learning the adverse action that was taken against him. In other offices comparable to Dallas around the country, would foreign service officers normally rotate to substitute in for the most senior person? There was some testimony given by the agency supervisor saying that that could be a normal practice where a level three would be supervising level twos. But this, according to the evidence that was introduced in the record, this was not a normal practice instituted in the Dallas office. This was a new procedure and done in association with Higbee about to assume. But was there any evidence that anybody else did it that way? In other words, what was the normal procedure within the State Department, setting Mr. Higbee aside for the moment? I think the normal procedure is to go ahead and let the next senior official take over those duties. They didn't rotate it among the people for training? They did after implementing this new policy, but before that. Did they do it agency-wide or just for Dallas? There wasn't any evidence in the record indicating that this was agency-wide that they did this, but there was testimony to the effect that they believed this would enhance foreign service employees in gaining promotions in the future. However, there's also evidence in the record that disputes that logic, and the person who testified that this would allow foreign service didn't even know how the promotion and general service employee would be promoted as well. So we believe that shows the pretext in this case. The policy that's implemented demonstrates that it's inconsistent with the practice. Foreign service, in order to move to the next level, doesn't have to assume these supervisory roles to get to the up-and-out policy implemented in the foreign service workforce. So before this policy went into effect, was Mr. Higbee the only person that was put in charge when the supervisor was gone or out of town? Was he the person that would automatically be in charge? I don't know if the record conclusively shows that, but I think the evidence doesn't exclude that. The declaration given by Mr. Higbee says that whenever his supervisor would go ahead and leave, he would assume the duties. I don't know if there's any evidence in the record that indicates for how long that was going on, but in his evaluations he was the next senior official, and as directed he would go ahead and assume that position of stand-in supervisor at that point in time. So we believe that is an adverse action pretext as well. The supervisor in Houston who was responsible for recommending this policy be implemented said, well, I didn't even know about Mr. Higbee's prior EEO activity. However, there's record evidence that has caught her in a lie. Mr. Higbee testified himself and offered contradictory evidence saying that he advised her himself of his prior EEO activity, and also one of his direct supervisors, Mr. McGrath, also said right before he retired in July 2008, I spoke with Cotter, who was a supervisor in Houston, and advised her of this employment action, this prior EEO employment action that was taking place. So I think a lot can be inferred by this lie that she was caught in, and it should go ahead and go to being inferring that this was pretext. The next adverse action I'd like to go over to the court with is stripping Mr. Higbee of his title and rank. In 2011, a new supervisor started in the Dallas office, and this new supervisor started questioning Mr. Higbee in his evaluation about whether he really was a senior criminal investigator. And that went ahead and led into a dispute with Mr. Higbee over his role in the office. And while the supervisor semantically might have changed a few things, I would have to concede that the evaluation was in line with the prior ones. However, more importantly, there's evidence in the record that demonstrates Mr. Higbee's role in the office changed. His instruction to other employees in the office was taken as less authoritative. He was given a reduced role, and we believe that constitutes the adverse action in this case. Could you be more specific, please? The reduced roles in supervising other agents. He claims that whenever he was given the responsibility to lead other agents in the office, based off of Tyler Farah, who was a supervisor, the lower agents would not respect him as much. And so it was kind of a continuous action of degrading Mr. Higbee's position in the office. So while the evaluation might not have formed substantively, others in the office, and Mr. Higbee's declaration testifies that he was not taken authoritative, not given as much complex cases as his designation accorded, and he was taken an adverse action. And so the next link is the causal link. And when Tyler Farah learned of the EEO, the prior EEO complaint in 2001 and 2009, he went ahead and he took this action. And there was a holdover from the prior Houston III, which they call him Vallee. And Vallee was the individual who was part of these decision-makings and stripping away these titles and these roles. So we believe the causal link is through Vallee and him learning of this activity, prior activity. And, again, the overarching theme is these Foreign Service supervisors saw Higbee. He was allowed to stay for many years in the same office while they were being subjected to being moved all over around the world. This is something that he was able to receive as a benefit of his prior EEO activity and that he was retaliated for against it. Finally, I have a minute 30 left. I'd like to go ahead and talk about the third adverse action. The third adverse action involves a desk move from the 11th floor to the 7th floor, coupled with taking away his duties to act as the liaison to the U.S. Passport Office. And this adverse action was taken shortly after Mr. Higbee returned to full-time work at the Dallas office, and in the eyes of his coworkers was seen as a demotion. He also presented evidence that another agent moved into his office and assumed the role that he was acting as a liaison. This action was also taken by a supervisor, which is an adverse action, so he could be monitored under more close supervision. This is undisputed and given reason by Taliaferro. However, in his designation as a senior criminal investigator, he was supposed to have more free reign. He was supposed to give in complex, take the lead. So instead of being in that position where he was on the 11th floor and not subject to the same supervision, he was taken down to the 7th floor, seated right next to the supervisor, more restriction, more supervisor, contrary to what the manual provides for that. So that's an adverse action as well. And the causal and the pretext in relationship to this one is pretty similar. The only exception is that it was done after about three weeks after Vallee was deposed in his 2009 litigation. So within this three-week period, there's a temporal proximity to the protected activity. I'll go ahead and reserve the rest for rebuttal. Yes, you've saved time for rebuttal, Mr. McClain. Thank you. Mr. Stoltz. Thank you, Your Honor. Brian Stoltz on behalf of the Secretary of State. May it please the Court. The district court correctly granted summary judgment in favor of the Secretary of State, and this court should affirm that judgment in its entirety. I'd like to address first right off the bat an issue Judge Owen and Judge Prado, your questions alluded to, of what were the circumstances under which employees could step into the role as an acting supervisor in an office, and you asked about record evidence. I'll direct you to page 1418 of the record, Mr. Taliaferro's deposition. Mr. Taliaferro became the supervisor of the Dallas office in November 2010. He was not in Dallas or in the region back in December 2008, which is when this occurrence of the rotation of the duties started, so he had nothing to do with the decision when it was implemented or anything. He was asked in his deposition, nonetheless, about this, and on page 151 of his deposition, which is at, again, 1418 in the record, he explained, it's very common in DS, in this agency, diplomatic security, that agents of a junior level will step up in an acting role, and for that time period, that time period, have supervisory authority over other agents who are more experienced or of a higher grade. So that's Mr. Taliaferro's testimony. There's also evidence in the record from the Houston supervisors and their declarations that this was a training method, essentially, to get these foreign service officers experience while they're in Dallas before they move on to their next posting, which could be overseas or could be in some other environment where they're going to have to step into those roles. Is it clear that this practice wasn't just in Texas, but it was in other agencies nationwide? Yes, Your Honor, because, for example, Cliff Taliaferro, he had been posted in Pakistan. No, but from the context of his testimony, you can clearly see that it deals not just with the Dallas and Houston offices, but it's pretty much agency-wide. Correct. I think that's correct. He talks about you can be elevated to an acting RAC, which is a resident agent in charge. That would be an office like Dallas. You can be elevated to an ASAC, which would be a special agent in charge. That's what they refer to the field offices domestically. And then he also talks about a super RSO. An RSO is a regional security officer. That's when these agents are overseas. They're no longer referred to as special agents. They're referred to as regional security officers because they have responsibility for, like, the consulate, say, in Pakistan or the embassy in Iraq or something like that. So it is clear from Mr. Taliaferro's testimony that this was a worldwide practice. Wherever they were, it was common for this to occur. I'll also point out the last thing on that issue is at page 1578 of the record, Mr. Higby describes that it was only in the summer of 2008 that he had sort of assumed these temporary roles of stepping into being the acting supervisor in Dallas while there was a transition going on, basically, from one supervisor to another that was arriving. So it wasn't a, you know, the record doesn't reflect that it was a longstanding practice or that it was sort of, you know, the only way it could be done. The district court's decision, of course, applied to the McDonnell-Douglas framework. There's no dispute that that was the correct framework to apply. The district court found that there, first of all, had been no showing by Mr. Higby to meet his burden to establish a prima facie case of retaliation. The district court then went on and considered in the alternative, even assuming that there had been a prima facie case, the pretext analysis. Before you get to that, what about the co-worker's testimony? I mean, there seemed to be direct testimony from co-workers that what happened to him was that they considered a demotion. I believe the reference to the co-worker's testimony, the only co-worker testimony that I'm familiar with, involves this March 2011 occurrence where Mr. Higby moved from the 11th floor of the Federal Building in Dallas to the 7th floor. And just for background, the 7th floor is the area where all the diplomatic security officers are normally officed. Mr. Higby had been placed on the 11th floor because of a space issue, and basically they didn't have space at some earlier time. Now they did. They were going to bring him back in. A co-worker named Banks, I believe, is the co-worker, and this is in the brief, who said he viewed it as some sort of demotion or some sort of problem that Mr. Higby had been moved. But Mr. Banks also said this was all secondhand knowledge and information and essentially hearsay. The district court found that all this information was hearsay, specifically ruled it out on that ground. And in Mr. Higby's appellate brief, he has never challenged the hearsay determination. So our position would be that that issue has been waived, and in any event, it was not an issue. And in fact, we believe that the district court's judgment can essentially be affirmed on every ground and on any of the grounds that were addressed in the McDonnell-Douglas framework. So the prima facie case, which is causation, and also whether or not these actions were adverse, and also then the pretext analysis at the end of the line. And for essentially all of the reasons given by the district court in its 25-page memorandum opinion in order, and also for the reasons in our brief, the decision can be affirmed. I'd like to focus on causation because I didn't hear a lot about that. You know, causation, I think, is a big issue in this case because I heard counsel, for example, in discussing the December 2008 occurrence where these duties of the acting resident agent in charge were rotated. He said that the only protected activity was the earlier 2001 complaint. So we have a seven-year gap in time between the earlier protected activity and the alleged retaliation. And not only do we have a seven-year gap, but in that seven-year period, we know and the record reflects that the supervisor from 2001, who was originally the subject of this complaint, the supervisor who was allegedly discriminating against Mr. Higbee at that time, he had transferred out of the region in 2002. There had been a number of new supervisors coming in. Basically, every two to three years, the supervisors rotate because the Foreign Service has you on a two- or three-year track here. Then you go somewhere else. Then you go somewhere else. So by 2008, you're multiple supervisors down the road who are now in Houston, and there's no evidence that these new supervisors in Houston had any sort of retaliatory animus or grudge or bias against Mr. Higbee on account of the 2001 EEO complaint. They were not the targets of that complaint. They were not alleged to have ever discriminated against Mr. Higbee before in connection with any of that. Mr. Higbee admitted that he didn't even know them at the time that he made this earlier complaint. So there's absolutely no causal link between the 2001 EEO complaint and the 2008 actions. Moreover, in Mr. Higbee's brief, I believe it's on page 19 and 20 of the brief, the only sort of explanation he gives of why there should be a causal link is he says that there was an institutional memory of the earlier EEO complaint with no citation to the record nor any citation to legal authority for what this institutional memory theory is. And he also says that Mr. Higbee's supervisor imparted knowledge of the earlier EEO complaint to a later supervisor. Again, though, no citation to the record for that. There's no evidence of that. The 2001-era supervisor was never deposed in the case. There's no evidence from him. And also the record does reflect that there was multiple new supervisors who came in. So we think on causation alone, essentially for all of these adverse actions, the alleged adverse actions, Mr. Higbee failed to meet his burden like a prima facie showing. The next two adverse actions that he claims are in January of 2011 and March of 2011. And I think when discussing causation, you can sort of group those two together because they both occurred in a relatively short time period under this new supervisor who is Mr. Cliff Talifaro. Mr. Talifaro arrived in Dallas in November 2010. Now at the time Mr. Talifaro arrived, and I believe he came from Pakistan, he had not been in the region during any of the prior activity. Mr. Higbee's most recent EEO activity at that time was an April 2009 complaint he filed relating to the issue of who got to be the acting resident agent in charge. So you have a complaint in April 2009 that's filed, and now you're fast forward almost two years to March 2011 and January 2011. A new supervisor who, again, has nothing to do with this former complaint, was not even in the region when that complaint was made, certainly was not the target of that complaint, has no causal connection to that complaint at all. And the allegation is that somehow this two-year-old complaint is prompting this alleged retaliation. And I think the district court quite correctly concluded that there was just no evidence of that, there's no support for that in the case law, that the time difference, the difference in supervisors, all these things weigh heavily against finding any causal connection. How long were these time periods where someone else took over while the SAC was out of town or gone? I mean, we're talking about a week or a month or a couple of days. Does the record reflect how long these temporary in-charge periods were? I think the record reflects that. In the summer of 2008, there was a new supervisor coming on board in Dallas, and the old one was sort of transitioning into retirement. So I think during that period there may have been perhaps a month-long, like from June to July of 2008 period, where there was a temporary acting rack, and that was Mr. Higby at the time. I think later, though, it would be even just for the most part only a few days at a time. If the current supervisor was taking a vacation or annual leave and was going to be gone for a weekend or possibly up to a week, but I think it was generally not an extended period of time unless it was one of these weird periods which were not that common of a change. I'd also like to address the issue of materiality briefly. I think the district judge was correct to conclude that these actions were not, did not rise to the level of a materially adverse employment action for purposes of supporting a retaliation claim. And, you know, I think there's a disconnect here between the rhetoric and the arguments that are made in the brief and what the facts actually show happened. So, you know, for example, in Mr. Higby's brief, he talks about being stripped of his title, referring to the occurrence in January 2011 where the new supervisor in Dallas, Mr. Taliaferro, questions him about, you know, what is this senior criminal investigator title? I've never seen this before. What is it? But if you read in the brief itself, there's an excerpt from Mr. Taliaferro's, you know, that Mr. Higby relies on, and he doesn't purport in that, in there to actually have taken away the title. He just asked him, where did it come from? And then says, oh, well, I got that out of my prior EEO settlement. Okay, well, we can ask human resources about it. That's what the evidence shows. So I think the district court was correct to conclude that even though Mr. Higby tried to sort of use rhetoric, making these actions seem, you know, very materially adverse to him, such as saying that, you know, he was stripped of his title or he was deprived of these job responsibilities, what really happened was much more sort of everyday workplace mundane events. You know, his new supervisor was reviewing his work statement and had some questions about it, and they resolved it. He was asked to move four floors within the federal building back into the office where everybody else was working, and there was no change in his job duties. It was just simply a matter of space and having him back within the office. Back in December 2008, when the duties of acting resident agent in charge are being rotated, sure, Mr. Higby had had those duties at some point in the past, but there's no basis in the record to say that he was the only person allowed to ever exercise those duties. So there's nothing materially adverse about the fact that these duties are going to be distributed fairly to other agents. And finally, you know, the record is clear, I think, on the issue of pretext, that each one of these actions was supported by a very reasonable, non-retaliatory justification. You know, the training of these other foreign service agents who were going to be going out to other postings was very important. They were in Dallas to be groomed and to be trained, so it was important that they be allowed to share in the leadership responsibilities. There's no evidence to rebut that that was somehow a pretext for retaliation. Likewise, Mr. Taliaferro, when he arrives in Dallas in November 2010 and asks Mr. Higby about his title and about, you know, how come you're called a senior criminal investigator? I've never heard of that before. What is that about? And also, when he asked him to move back into the office with everybody else, he explained his reasons for it. He wasn't sure about the title. He explained his reasons. He wanted Mr. Higby to be back in the office with everybody else so he knew what he was doing so that he could better appreciate the work he was doing. There's no evidence in the record that any of these actions were, you know, based on retaliatory animus or bias. They're, you know, sort of common sense when you read it, reasonable things that any employer might do. So in sum, I think that at each stage of the McDonnell-Douglas framework, Mr. Higby failed to carry his burden, failed to make out a prima facie case, failed to show materially adverse action, failed to rebut or raise any fact issue about the, you know, the legitimate justifications given by the State Department for its actions. So we'd ask, and if there are no further questions, we'll rest on our brief and ask that the judgment be affirmed. All right. Thank you, Mr. Stoltz. Thank you, Your Honors. McClain, you've saved time for a vote. May it please the Court. Just go ahead and speak directly about the testimony of Banks and whether that was considered hearsay by the Court. Banks' testimony is in regards to the last adverse action that was alleged to take place in this lawsuit. And the Court did find part of his testimony to be hearsay. However, it didn't find the entirety of his testimony to be hearsay. Mr. Banks had direct knowledge of Mr. Higby moving down to the seventh floor from the eleventh floor. He also had direct knowledge of his own subjective belief that this was a demotion. And he also had knowledge that other people in the field, field agents, this would maybe negatively impact their view of Mr. Higby being taken from the eleventh to the seventh floor. Who was left on the eleventh floor? It was the U.S. Passport Office, and there was another agent put in there, a female agent that assumed the liaison duties according to Mr. Higby's declaration. And Mr. Banks also testified. His hearsay statements went to that effect as well of her assuming Mr. Higby's duties. What's your best case on causation? I mean, don't we have cases where the person who actually was aware of retaliation some years earlier then took an adverse employment action and we said the temporal connection is a matter of law was not there? Yes, those cases do exist. And, you know, our best decision is Cawthorne. The Cawthorne decision's Fifth Circuit's unpublished. The Cawthorne decision, because I think the biggest problem here is the lapse in time. You know, there was a significant lapse in time between each, and there were people moving in and out of supervisory roles. However, I think Cawthorne doesn't take away the possibility that a new supervisor, learning of the protected activity, can then retaliate. What was the time period in that case? It was seven years from 2001 to 2000. No, no, in the Cawthorne case. The Cawthorne? Is it a 2010 decision? No, how long? Okay, I'm sorry. It was two days after learning of the supervisor of the protected activity, the retaliation occurred. And so the court found it sufficient in that case, those two days. This is seven years. Well, there's different periods of time in this case. There's a seven-year gap between the first protected activity, and then there's, you know, a year or two-year gaps in between the second and third. Protected activity, the only protected activity was the original complaint, right? No, there was a subsequent complaint filed against the Houston officials, which regards the rotation in their official duties, rotating Mr. Higby out of the resident chief. What about what's your best case with regard to moving from one floor to the other being an adverse employment action? You know, there's definitely cases out there the government cites the Browning decision, and the best I can do is distinguish that case in this situation. Actually, I'm sorry, the Browning decision relates to the first protected activity. I would just go ahead from a common sense standpoint of taking away responsibilities, and I guess that goes back to the Burlington decision. It's not just the major aspects of hiring and firing. It can be an adverse action of taking somebody's responsibilities away, and in Burlington that's what happened in that situation as well. So you think in addition to being switched from one floor to the other, there were also some responsibilities that were taken away? His primary duty as liaison to the U.S. passport, that was part of the allegation. And, you know, all the inferences should be drawn in Mr. Higby's favor, and I think that's where the agency goes wrong. They certainly do provide arguments to each one of these, but the district court shouldn't have taken that as- What's his damage? Excuse me? What is his damage? What is his damage? Is there any monetary damage? You know, I think there are. He was negatively impacted in the minds of everybody. While his salary stayed the same, I think it has hindered his ability to get promoted to a new job. As a civil service agent, when you go ahead and apply to a job, you're competing with other individuals, and your valuations become very important. So when there's a new opening on the U.S. jobs website to apply, this would negatively impact- Did he ever apply for any other job? No, he has not applied for a job to date. So I believe he could go ahead and make the connection that there was that harm to him, and we believe that- How much money is he seeking in damages? I'm not sure if it ever came down to an amount. This was done away with at summary judgment, so the amount didn't come in. All right, thank you, Mr. McClain. Your case is under submission. All right, thank you. Last case for today.